Case number 14-1144 et al. INOVA Health System Petitioner v. National Labor Relations Board. Mr. Baskin for the petitioner, Ms. Sheehy for the respondent. Good morning. Good morning. Marty Baskin for the petitioner, INOVA Health Systems, and we're challenging the unfair labor practice findings of the National Labor Relations Board. You're asked to reserve three minutes for rebuttal. And in the short time we have today, I'd like to focus on the termination case aspect of this involving Nurse Miller and the question in particular, which we think is the key question, of the decision-maker's knowledge or lack of knowledge and animus towards any protected activity in which Nurse Miller may have engaged. We say it's a key question because this Court and many other circuits have held that there cannot be a finding of an unlawful termination under the Act for that reason. It seems like common sense, but the Board made no such finding. Well, if you look at the Board's decision, JA 67, where it starts to make its findings. Yes. And it talks about right line. Yes. And then it continues about the sequence of events, impossible to separate, et cetera. Yes. And goes on. What did the Board fail to find? The Board failed to find that Dr. Pasternak, you don't see Dr. Pasternak's name mentioned in that paragraph. If you look at the paragraph also at the top of page 67 of the appendix, that's where they quote the undisputed evidence of what Dr. Pasternak knew, which is the email, the February 25th email from Chief Nurse Executive Conway Moreno. Yes. And if you look at that email, it says simply, we have a 20-plus year nurse. We did not even give her name. We've had several hotline calls about profanity, vindictive with schedule, sexual innuendos, but a great OR nurse presents a balanced picture. She's been warned in the past about intimidating and inappropriate behavior four years ago and recently. Then goes on to describe there's a split in the department about what to do with her. Not one word about putting Dr. Pasternak on notice of some February 13th email, being protected, not mentioned. So when I read the Board's decision, and maybe I'm just incorrect about this, the Board seemed to think the issues before it were whether she had engaged in the animus, timing, those events that the Board found established or met the General Counsel's burden such that the burden shifted to your client. And then the Board went on to say that even if your client had a reasonable belief, it has not shown it would have suspended and discharged her in the absence of her protected activity. In other words, I don't see the issue as the Board understood it as to what Dr. or Mr. Pasternak knew. There wasn't any question about who had the final say. The question was, under the right-line series of cases of Board authority, had the General Counsel met its burden? Had the burden shifted? And had the hospital rebutted the inference? Yes, but they misstated what their burden was, what the General Counsel's burden was. They simply skipped the step of knowledge of the decision-maker. And this is not for lack of us having presented it to them. Let me give you a hypothetical. Imagine that, clearly hypothetical, so you don't have to defend your client. I'm not remotely suggesting this is what happened. But in some bad company, a bunch of supervisor and high-level managers get together and say, let's get rid of this union organizer. And they put together a series of complaints about this person's behavior. Intimidating behavior, taking too long of breaks, bullying people, using inappropriate language, being very sexually explicit in the operating room. All of these things that you have here and more. And they wrap that package up and they go, well, we don't want to look too obvious, so let's throw in some good facts, too. This person happens to also be good at their job. Not everybody. We've looked at this carefully. Some people say give another chance. But we assemble our nice, neat package and we deliver it. We'll launder it through Dr. X. And Dr. X looks at that package, assembled by high-level managers who are clearly anti-union in my hypothetical. The decision-maker doesn't know about that, just looks at this package. Can one fairly say that anti-union animus was not a motivating factor in causing that person to be terminated? Well, that hypothetical has never been applied to board decisions. I'm just asking you as a practical matter. Clearly you would say anti-union animus was a factor in that decision, right? It would have never been teed up for the decision-maker but for the anti-union animus, right? Yes. Okay. Would that satisfy right line? I'm sorry. Would that satisfy the requirements under right line? Would that satisfy if it was no knowledge by the decision-maker? No, but the actual person sort of made the final sign of the dotted line, but the only reason this person's head was on the chopping block was because the high-level managers and supervisors all had well-documented anti-union animus and wouldn't have done it and weren't doing it for any other reason. Right. I'm going to resist your hypothetical and not concede that it would apply as the board case law has been defined by this court and other courts, but it is so far, your description of it well demonstrates why this case does not meet anywhere near those standards. No, no, but if you have, I just want to play with my hypothetical, and that is how could one as sort of even basic grammar say that anti-union animus was not a substantial factor, substantial causative factor in that person getting fired? The only reason they were the one teed up for the final person was because of their union activities. Well, that would be an interesting and challenging case to argue. I don't think it would actually be all that challenging. I think it would be pretty clear that it was a causal factor in that person's firing. I guess I'm having trouble thinking why it's a debatable or interesting question. Well, I guess it's just fortunate that it's so far different from our facts. There was no teeing up. There was no communication from one supervisor to another. The original complaints, which the judge concedes, were unsolicited from the coworkers of this nurse who were terrified of her, who were extremely upset and offended by her workplace behavior. It was communicated. Well, I thought the board found, now to get back to this case, that, in fact, there was a very selective and biased investigation, just from our standard of review. We aren't deciding this as original fact finders. From our standard of review, there was a very biased and one-sided investigation that came forward with these facts and said people were terrified when it turns out an awful lot of people weren't. Ironically, that finding runs squarely into this court's decision in Detroit News, in which this court said that it's not the board's business to dictate to employers how to conduct their investigations. And in reality, this investigation, they bent over backwards in her favor. They didn't have to go interviewing any random witnesses. They could have taken the individuals. Well, what we're dealing with is the findings of the board and our standard of review. So in your brief, you cite the Flagstaff decision as supporting your position. Where in Flagstaff, what specifically do you think in Flagstaff supports your position? Well, it says if general counsel relies on circumstantial evidence and legal fictions about constructive knowledge, it does not carry its burden of showing a decision maker knew about the employee's union activity. All right. More importantly, permitting circumstantial evidence and legal fictions to trump direct proof, such as we have here, is absurd. But what is your direct proof? The direct proof is the memo from Conway Morena to Pasternak, not to mention his denial of having any knowledge that the nurse had engaged in protected activity. So you're saying that under right line, the board could not permissibly conclude that there was a violation of 8A1. And I'll put it hypothetically. In the hypothetical situation Judge Millett just described. In other words, the case is teed up for the decision maker in a way that's rife with animus. And at least from the ALJ and the board's findings, there was not an incomplete, thorough investigation. You're saying that we would have to find, as a matter of law, that the board departed from its right line precedent? If they skipped the step of establishing knowledge of the decision maker. Where does my staff say that? I couldn't find it. That's just where I read. No, all it says is circumstantial evidence. Now, are we talking about the hypothetical or about this case? If we're back to the hypothetical. I read what Dr. Pasternak, is it Mr. Pasternak? Doctor. Dr. Pasternak said he didn't know about these emails, all right? All he knew was what he was presented. Yes. And he acted on the basis of that information. He didn't go out and make any independent investigation on his own. Correct. So it would not be consistent with board precedent applying the right line analysis? There has never been a case so holding. Now, what you are talking about is essentially the cat's paw type of argument that has reached the courts under Title VII in that context. I just recently checked. Has there been a single board case applying the cat's paw analysis under right line? It hasn't happened. So you're not making, just let me be clear about this, you're not making an argument that the board, that this court would have to reverse because the board misapplied its right line precedent. Rather, yours is simply a substantial evidence challenge. Well, I think it's both because they did not even make the. Well, the authority you cited doesn't say what you said it cites. That's why I want to be clear about it. It's all right for the board, says the authority you cited, to rely on circumstantial evidence and inferences. But this board didn't.  I guess I have to say, where is the general counsel carrying its burden of proof? Where is the board carrying its burden? It is their burden at the first step to show the prima facie case. Here's where I think maybe the confusion is. And that is, your argument says the board under right line has to show that the last person in the decisional line had the anti-union. Well, I think you're begging the question of what the decision-making process is here. You're saying that last person has to be the one with the anti-union. You're embracing the cat's paw theory at this point and saying, look, he did not have any anti-union animus. It doesn't matter how the case got to him, how the information he was given to make his decision was formulated. He individually didn't have the animus. And listen, I'm understanding the board to be saying, so I'm trying to frame up our legal issue here. So you're saying that last person, the decision-maker, when he made the final sign on the dotted line, didn't have it. I take them to be looking at a collective decision-making process. And if anti-union animus was a causal factor in that final decision being made, then there's a violation. So is that the difference? You say it has to be anti-union animus in the final actor. And they're saying if there's a causal factor in the decision-making process so that the decision-making process would have never been made, it would have never gotten to Dr. Pasternak, but for anti-union animus, they win. Am I understanding that right? Actually, I'm saying the board never said anything at all on this key issue. Yeah, it's not just the animus. It's the knowledge. Exactly. The record does not have any evidence to support the proposition that Dr. Pasternak even knew about the alleged protected activity. And there is no finding of circumstantial evidence leading to that conclusion, no finding of inferences, no finding of imputation. They simply stopped at Seneca and Gorman. By the way, Seneca also had no knowledge of supposedly protected February 13th email, even though the board says four different times that he did. There is no record evidence of that. It was something that was inferred and made up by the administrative law judge, which the board disavowed. And they cite Gorman, the HR director. There is a specific finding that she made no recommendations about the termination. Right, so just to clarify things, I'll take both knowledge and animus. Right, they're very closely related. Talking about animus, you don't have knowledge of it. Obviously. So yours, again, is that the final decision-maker was clean. And whatever happened in the process that led to her being teed up for the final decision-maker is insufficient as a matter of law under right-line? In this case, it did not. You said a right-line error, which is a legal error, not evidence. Yes, but it's a right-line error based on this case because the board made no finding. And that is the error. What did they have to find? They had to find. That Dr. Pasternak had knowledge, that the decision-maker had knowledge. Knowledge and animus. Knowledge and animus. Right. He couldn't have animus if he didn't have knowledge, if there was protected activity. And would that same answer then apply to my hypothetical? Because in my hypothetical, the person who made the decision didn't have knowledge or animus. But the only reason the person's head was on the chopping block was because everybody else in the process had it. So would your same answer apply to my hypothetical? If I can apply to your hypothetical to this case. No, no. I actually really would just like an answer on my hypothetical, what right-line law requires. Because I think it's the same, at least factually, on this question of knowledge and animus by final decision-maker. Right. If the board makes a finding based on collective activity or outright falsification, then it is conceivable under your hypothetical, if the law is changed by some court, no one has ever so ruled, it is understandable how someone could reach that conclusion. But the board would have to make a finding. But in my hypothetical, the decision-maker lacks knowledge or animus. And is your answer that even if the decision-maker, I really don't want to put words in your mouth, so if I got this wrong, I thought you just said that even if the decision-maker lacked knowledge or animus, if the board found that all the others in the process had, did you say falsified things, or essentially engaged in illegal behavior and setting this thing up for illegal animus and knowledge, and setting it up for the final decision-maker, that would be okay under right-line? I'm really trying to understand what your answer was. If the board made those types of findings, it would be a closed question. Would it violate it or not? I don't know. Well, is your position that the final decision-maker, him or herself, must have the knowledge and animus or not? Yes. That's the position not only of this court, but of all the other circuit courts we cited, which, by the way, this court cited. Well, then I don't know why you're resisting my hypothetical. If every court has held that the final decision-maker has to have the knowledge and animus, then the answer to my hypothetical should be easy. Because none of them considered the extreme facts that are described in your hypothetical. It shouldn't matter. If it's a question of law, then the final decision-maker has to have it. Okay. I think I'm clear now on what your position is. I will add that your position is that's not this case, quite clearly. Well, of course. That's what hypotheticals are for, to test the boundaries. But we're not asking you to make new law here. Where the Board has not made any such finding, you don't reach any of those interesting hypothetical issues. And where the Board erred in this case, right at the paragraph that Judge Rodgers identified, is in its recitation of how the general counsel proved the first step of the process, which is so crucial. You can't have improper motivation unless you have the knowledge and animus. I guess I read their decision as finding, and put aside your substantial evidence arguments about Dr. Seneca, but finding that the timing of her suspension, the references to her prior concerted activity, those things showed that there, in fact, for other folks in the line, at least up through Dr. Seneca, that there was actual knowledge and animus. Isn't that... Dr. Seneca's, sorry, not good enough. He said he's not involved in the decision. He did not know that she engaged in this protected activity. And the Board made a big point of saying Dr. Pasternak was the decision maker. If they wanted to extend it to Chief Nurse Executive Conway Morena, they'd have another problem. She didn't know. She doesn't say anything about it, and the memos to her don't say anything about it. This whole thing is trumped up over a February 13th email that no one in higher management knew about or cared about. Only a low-level nursing educator was furious about it. Was it okay for, is it reasonable for a Board to find that it was quite unprecedented for Dr. Pasternak to be involved in this decision? There's almost suspicion about the fact that he was plugged in at the last minute at all, having never ever, according to the record, been involved in a nurse firing. And the fact that this, everything, this investigation came to a screeching halt right after the February 13th email, and pretty clear anti-union animus on the part of, I probably won't say it right, Magliozzi? Magliozzi or whoever. She was upset about the February 13th email. She wouldn't have recognized it as protected activity. But let me answer your question about was it reasonable for the Board to wonder why Pasternak was involved. It's answered in the same email from Conway Moreno. She says, we've got, more likely the doctors and the anesthesiologists may say something to you. Conway Moreno's in charge of nurses. She's concerned that you're going to be caught off guard. So we should discuss this further. Well, that's different from informing somebody about a decision I'm making as opposed to passing the football and say, you make this decision about a nurse, which you never have, and then framing it in terms of a zero-tolerance policy, which had never before been implemented in this way. Well, the direct evidence and the only evidence in the record, because the General Counsel never called Conway Moreno to testify, and apparently, well, they did ask Pasternak, and he said it was rare. But, you know, she was a polarizing figure, Nurse Miller. There was ample reason for them to think she was going to sue them, which, lo and behold, she did, and that they wanted to take it to the top to make sure they were doing the right thing. And specifically because of the conflict between the doctors and nurses, something else that the board didn't fully appreciate, was something that they felt that they were going to perhaps need higher-level help to deal with. She was not an ordinary nurse. So that would be the answer to that part of the question. But I see my time. I hope I get a little time in rebuttal. I'll give you a couple of minutes, of course, yes. Thank you. Let's hear from a respondent. Good morning, Your Honors. Barbara Sheehy for the National Labor Relations Board. Good morning. Obviously, I'm going to focus on the termination as well, and then we'll move on to any other questions if there's time after that. Any other claims? Any other unfairly practiced? Do you have evidence that Pasternak had any knowledge? Other than what Judge Millett was describing, I think. Let's have the other thing. Do you have any evidence that Pasternak had any knowledge of the protected activity? Before the board, there was evidence that all of the managers that were involved in the decision-making process. What evidence was there that Pasternak had knowledge of the protected activity? Pasternak received the email from Conway Marina, in which I know Donna Miller's name was not used. However, it references that it's a pediatric nurse married to another nurse. There are no other married, as far as the record discloses, there are no other married people that are working in the exact same OR room. So it's perfectly reasonable to believe that even though she wasn't named, that it was understandable who it was. And what did the email say about the protected activity? The email references, Conway Marina references that Donna Miller, in 2005, had been disciplined previously for vindictive and intimidating behavior, referencing 2005 protected concert activity. And Conway Marina also... What's the part of it that's supposed to put Pasternak on knowledge that there was protected activity to which he could be exercised? That Conway Marina is letting him know that she had... What does the evidence show of anything that gave Pasternak the knowledge that this person had engaged in protected activity? I've answered as best I can. There's the email, the February 25 email. What's the part of it that does that? I don't... I know the acoustics are bad in here, but you do understand... I do understand your question. Okay. It does not be... If you're expecting me to be able to say that the board said... I'm expecting you not to be able to. If you are able to, change my mind. But I'm concerned about whether the board had knowledge before or not. Don't psychoanalyze my motives for being concerned. Answer my question. Your Honor, there is nothing in Conway Marina's email that says she does not use the phrase... There's nothing in the record that puts Pasternak on notice of any protected activity. Not if it's expected that Conway Marina had to use the precise words protected concerted activity. This time, don't talk over my question. And this time, answer it. There is nothing in the record that shows evidence of Pasternak having knowledge of the protected activity, is there? No. Thank you. Well, what I saw in the record about Dr. Pasternak was his denial that he knew about certain emails. Right. That's the only denial I see by Dr. Pasternak. Right. In other words, following up on Judge Sentel's question, given the page that counsel or petitioner referenced, is there other evidence, because these pages are not sequential, detailing what information Dr. Pasternak had? No. As a general matter in the record on cross-examination, Dr. Pasternak denied knowledge. Dr. Pasternak repeatedly said, no, I didn't know, no, I didn't know. Didn't he deny making the decision? Didn't know what? Didn't know, and he was unaware of any of the emails, didn't have any conversations with anybody, said he never met with anybody. He knew nothing about the protected activity. That was his testimony, right? That was his testimony, and I believe the administrative law judge discredited in large measure many of the manager's testimony where they all said that, they discredited many of the witnesses, does not say that there is any evidence that Pasternak had any knowledge. Absolutely, and I didn't say that. I merely said the administrative law judge. What about Seneca? What's the knowledge that Seneca had? What's the evidence that Seneca had? Well, Dr. Seneca didn't testify, so what we have. What's the evidence that Dr. Seneca had knowledge? Dr. Seneca handled her 2005 appeal, so Dr. Seneca was well aware of what Donna Miller did in 2005. When did this event of which we're finding the, which the board found the unlawful activity, when did it occur? 2009. She sent the email. This is four years later. Three and a half years later, yes. So you do not have proximity in time between the protected activity and the alleged unlawful, unfair labor offense. The board also found that Dr. Seneca had a conversation on February 16th with Gorman right after she received the February 13th email. So while we have direct evidence on the 2005, that Seneca had knowledge of the 2005 activity, there was circumstantial evidence, and the board found, that in close proximity, one workday after the February 13th email got sent, right after Gorman had the meeting with Migliosi to discuss the email, that she then spoke with Dr. Seneca, and they spoke about Donna Miller's termination. The board determined that it was reasonable to conclude that Dr. Seneca was involved in the termination proceeding. That wasn't an inference by the administrative law judge. That was a finding by the administrative law judge on page 34 of the appendix. I conclude that Dr. Seneca, who did not testify, was heavily involved in the decision to terminate Donna Miller. So while I think it's been noted many of the inferences were disavowed, oh, I'm sorry, all of the inferences were disavowed in the case, this was not an inference. This was a conclusion by the administrative law judge, picked up by the board, where the board set, or where the administrative law judge also goes on to explain, there's no other reason for Dr. Seneca to have been meeting with Gorman one day after the email got sent, or for Dobbing to have testified that she kept Dr. Seneca up to date on this low-level nurses termination proceeding or the disciplinary proceeding that was under investigation. Can you address the legal question of whether Dr. Pasternak's individualized knowledge or animus matters? I don't believe that it does. I don't believe the board has ever said that the actual decision maker who writes the termination letter has to have been the single person that all of the knowledge and all of the animus had to go up the line, as opposed to what we have here, which is a collection. How about some knowledge or some animus? They said before that, let's assume, my hypothetical to your friend, and that was zero knowledge by not just signing the paper, the one who made the final call. Zero knowledge there, but everything else in the process is poisoned with knowledge and animus. Do you know what the board's position would be in that situation or what their precedent says about that? I don't think their precedent speaks to it. I can't speak to how the board would rule in that decision, but I don't think the precedent can be reasonably read to say that the decision maker has to have actual knowledge. And I guess to answer your question in terms of on the sliding scale, if the example is zero knowledge on the part of zero knowledge and animus on the part of the decision maker, but everybody else down the line on that, I think this case makes it clear that the board says in the collective sense all of these people knew, and so the decision makers, in effect, knew. And I think the problem is the final decision maker. Is there a board decision, whether or not affirmed by a court, that finds great relief on the basis of an unfair labor practice which constitutes a firing with alleged animus where the person making the decision on firing did not have knowledge? I know that's a convoluted question, but I think you understand. I do understand, Your Honor, and I think the board, the cases— You do understand. I do understand your question. Let me know if my answer doesn't make any sense, then we'll try again. So I think that most of the cases that I'm aware of under right line where the board hasn't required actual knowledge by the decision maker are ones where the board has imputed that knowledge. And this court in Flagstaff has reversed on those grounds and said you can't automatically impute the knowledge. So in those cases— There is no case where the final decision maker had no knowledge of the protected activity where right line has been followed to find an unfair labor practice. Is that correct? Not in circumstances like this. Again, I would say that the board— There is not any case where there's been no evidence of knowledge on the part of the final decision maker where the right line finding has resulted in an unfair labor practice. Again, I would say only on the imputation of knowledge because I believe in those cases the board has said, or that in those cases there isn't. So to answer your question— Where imputation has been upheld, there has been some sort of circumstantial evidence from which it was imputed. Right, exactly. And we would argue, obviously, as we did in the brief, that there's circumstantial evidence here. The board didn't impute the knowledge because I think that there was enough of the weight of the circumstantial evidence. It didn't mean that the board needed to do that and worry about some of the adverse case law there is on imputing knowledge. This is what I'm trying to get to. Because I found it just baffling that we're having this conversation about Dr. Pasternak's knowledge after Staub versus Proctor Hospital and after the cat's paw theory, which arises from the exact same motivating factor causal analysis. It's been discredited. And so this notion that you can essentially launder a violation as long as you find somebody high enough up that they wouldn't spend their time learning the details and then you feed them tainted information, that's going to somehow get you out of liability. And so I'm just confused as to what you're saying about the board's position here. Because I thought your answer was it doesn't matter what his knowledge was, Dr. Pasternak's knowledge was, as long as the only reason her head was on the chopping block is because all these other folks in the process, who are high-level managers and supervisors, set it up and animus and knowledge was found as to them. Is that your position as to what the board did? And is that what you think the board did here? That's what I believe the board did here. And I think we flushed that on the brief. But to the extent I was answering questions that were asked of me, as in are there other pieces. So this is the first time that's happened. That I'm aware of that the board has treated it in this manner, where there's been a collective. And it could be that it's the first time where there have been 10 people or 7 to 10 people that have been involved at all stages and they go up different chains and that it elevates quite, quite high. But where the ultimate person who says you are fired didn't have a conversation with somebody where that person says she's engaged in protected, concerted activity. We don't have that on the record. I believe there was circumstantial evidence and inferences that were disavowed, however, as to what sort of conversations happened. Because there's a big gap in the process. There's the email saying we need to discuss this. Let's talk tomorrow morning. That's from Pastranac to Conway Marina. And then several hours later, where there's no other information that was turned over, no other emails or anything, there's the decision that she's terminated rather than putting things off. So in your brief, you distinguish Flagstaff by saying that there the inference was trumped by direct proof that the decision maker had no knowledge. So counsel for petitioners says look at what Dr. Pastranac said. So why isn't that a clear application of Flagstaff? I think in Flagstaff what you had there was the board imputing the knowledge of a low-level supervisor to the decision maker. And I believe in Flagstaff you only had one person who knew, one person who saw the individual wearing the button. And then you had a relatively new supervisor coming on the scene about, I think he'd only been in the office for, I want to say, three to six months who ultimately decided to terminate the union official. And so the board imputed knowledge from the lower-level person who saw the single event of wearing the button, imputed that knowledge to the decision maker. And the decision maker, again, who had only been on the job for three to six months said, I never saw the button. I had no idea. So let me just be clear. Take the hypothetical that Judge Millett offered to counsel for petitioner. Is it your understanding then that in response to Judge Sentelle's questions, I understood you to say, and I want to be clear about this, that the board has never held that under a right line. It is sufficient if you have the situation Judge Millett described. But the person who actually made the decision to fire was pure as the driven snow. And as I'll take it to this case, all Dr. Pasternak knew was that his senior managers thought he ought to fire Miller. To my knowledge, there's not another case similar to this where there is an example of a decision maker like that. All right. Thank you. Can I ask you a quick one? Sure. We didn't get to talk about Gamble. Why was her statement to Nurse Perry about, you know, you shouldn't have volunteered, protected? What was collective about that? I couldn't figure out what was collective activity about that. Sure. I think the board speaks to the protected concerted activity, and that is speaking to, it was the long, it was the festering longstanding issue of the extension of the hours in the ambulatory surgical center that the nurses for, you know, decades before had been working a very set schedule, 9 to 5. Yeah, but where did they find that Gamble was making the statement as part of this long ongoing festering issue, as you said, as opposed to Gamble was just speaking, how do we know she was speaking for anybody other than herself? Well, first I would say that Gamble and Nurse Donegan, I think is her name, Donegan, the two of them together, and they're both nurses in that facility, the two of them together went to Nurse Perry after and speaking on, saying, hey, if you keep doing this, this is setting the expectation for all of us that we're all going to keep staying and working late. So I think that she was, at the very least, speaking on behalf of her and I think it's Donegan, speaking on behalf of at least those two nurses. And it certainly couched in terms of a well-known ongoing issue, which was sort of like, which is throughout this case, starting with Donna Miller being very vocal and being very much an opponent. What's the line between things that are sort of clearly collective and the Many of my friends look bad. You're doing so much. You're on the assembly line. You're producing three times as many widgets as we are. You're making us look bad. We've got a good thing going here. Does that count as collective activity? I don't know. I guess it would depend more on the circumstances under which it was said. I don't know enough. I don't think in that hypothetical. How do we know enough here when I think that we don't have a whole lot more than that here from the board finding? Unfortunately, we don't have a challenge also by the hospital to whether or not gamble engaged in protective concerted activity. So I don't think that issue is before this court. I think the question is whether she was not promoted because of what's now assumed to have been. That whole issue, the petitioner argues that the board has substituted its promotional criteria for those in the hospital. Aren't they correct in that assertion? I would say no. I think that it's clear that here, whereas we've talked before about all this absence of direct evidence and everything, I think here when you're looking at gambles promotion, you have a direct statement under oath by one of the deciding officials saying, one reason we decided not to give you the job was because of this conversation, which we've now said was protective concerted activity that was not appealed. Because of a conversation that you had that was protective concerted activity, that's one reason we did not hire you. And on top of that, you have findings by the Wasn't there evidence that they would not have done it harder anyway for that position? Certainly the hospital offered certain factors as to why. And several of them were discredited. Some of those were determined. The board dealt principally with the weight of the different factors, didn't they, in their analysis? Doesn't it look like they're using their hiring decisions instead of the employer? I don't know that it does. I think what the board did was looked at what some of the factors that were offered and said these were either outright fabrications or these were simply untrue, the allegation that she was a subpar performer. So I don't know that you could reasonably read that to say the board substituted its judgment so much as it's evaluating the evidence and saying, hey, your decision maker said we didn't hire her in part because of protective concerted activity, and we're going to have a look at some of the other reasons you offer. And some of those were denied on the stand by the individual who said them. Some of them are absolutely disproven by her performance evaluations. So I don't know that it's the board substituting its judgment so much as it's evaluating the reasons offered by the hospital and finding them wanting. I had one other question going back to the ALJ's analysis. I'm on DA44. Okay. The ALJ has earlier stated that the general counsel must establish the employer knew of the concerted nature of the activity. And let me see. No, I'm sorry. I'm 46. Paragraph 5. He talks about gaps in the decision-making process relating to the termination. Uh-huh. And he says I infer conversations regarding conversations I infer took place involved including Dr. Pasternak. What is your understanding of that reference? My understanding, let me preface that with the inferences are disavowed under the board. But to get to your question, my understanding of that, as far as I read the report, is that the gaps in time, the gaps that's being referenced here, is that emails that went and stopped with Pasternak. The last email Dr. Pasternak got was on February 25th. And he replied, I'm sorry, on February 26th at 826 in the morning, saying, I've got my concerns. We're moving to a zero tolerance. Let's talk. And emailing that to Dr. Moreno, Conway Moreno, rather. And then there's a gap in time, about six hours, I think, because the next email in the chain is about 1 o'clock in the afternoon. And that's when the director of HR, Keith Hull, is saying to his subordinates, listen, Patricia Conway Moreno is going to speak to Dr. Pasternak tomorrow. Let's close the loop with her and make sure we answer all her questions so she can go meet with Dr. Pasternak. So the expectation among everybody was that a conversation and perhaps a decision, at least a conversation on Don Miller's fate was going to occur the next day. So that appears in the ALJ's opinion in connection with whether the hospital had met its burden, the general counsel having met his or her burden. Yes. So was there evidence presented by the general counsel about conversations with Dr. Pasternak? No. Dr. Pasternak denied having any conversations or any knowledge. So there was evidence in the sense that there were denials on the part of Dr. Pasternak. Beyond what we have on the record here at 390? Those denials just go to the e-mails. I've thought and I can check it. No, but your knowledge of the record is we would not find that the general counsel presented evidence regarding these conversations in which Dr. Pasternak was included. To my knowledge, no, there's none on the record. I can't remember if the general counsel asked, did you have a conversation with Gorman at this time, or if they were more general questions of did you have any knowledge, did you know anything about this? But no, there's no evidence that Dr. Pasternak had conversations, which I think is why you see the judge making the inference. Thank you. Unless there are any other questions? Thank you. Counsel for petitioner. Thank you. First, I must make a couple of factual rebuttals. The statement was made that we waived our claim that Gamble was not engaged or was engaged in protected activity. I prefer you to page 48 of our opening brief. At the outset, the board improperly declared protected Gamble's attempt to discourage her co-worker from doing her job. I don't know how much clearer we could have made it. No, but you only distinguished it on the ground that it was a partial work slowdown. You didn't test it on any other basis, right? That we'll also concede. Right. But to me, us, that's semantics. I mean, that is similar, in our view, similar to what you were saying, what you were describing in your earlier hypothetical. That's what it means to say we've got a good gig here and don't mess it up, don't work hard. And I would add further, why would the institution be required to promote someone into a leadership position who is telling co-workers not to work hard? Why isn't that a reasonable thing for them to be concerned about? The cases that the board has cited deal with people being disciplined or fired for advocating partial strikes. That's not our situation. And here, Gamble not only had done that, but she told the answer to the question of how she was going to solve problems, she was going to growl back at the doctors. That is not what they were looking for. They were very reasonable in believing that this was not the right fit for the leadership position, as against someone who had sterling references at higher leadership levels. And so we stand on that, on our briefs and on those points about Gamble. But I did want to just very briefly respond to statements made, again, factually about the Seneca situation and the conversations. It was the general counsel's burden to subpoena the witnesses and beyond Dr. Pasternak if they were not satisfied, if they had not produced evidence of conversations. They did not bring in Seneca. They did not bring in Conway Moreno. There were no conversations in the record. The judge tried to make up for it by just saying, well, there must have been. And he says that multiple times, and the board properly disavowed it. Once the board disavowed it, there is no evidence at all, other than the e-mail that we have cited, which is the direct proof of what Pasternak knew, plus his response to the e-mail in which he explains. We don't have to wonder what his motivations were. He explains, we are getting towards a zero tolerance policy. This is unacceptable behavior, whether it's from a doctor or a nurse, and we can't accept it and neither can the board. And so on that basis, the decision should be upheld. What's a little curious to me is that the e-mail, as e-mails normally do, doesn't offer a whole lot of details. It says intimidating behavior, offensive language, those types of things, very generalized. And it struck me as really curious, and maybe you'll say it's my job not to be curious, but that someone at his level without, you know, before they're going to apply some very heavy hammer remedy here, would actually want to know some particulars, would actually want to be. And I thought what I sort of understood the ALJ at least to be finding is that it's incomprehensible that someone at his level would go, hey, I'm so madly in love with my zero tolerance policy, all you have to do is send me an e-mail that says someone vaguely has engaged in offensive use of vulgar language and offensive intimidating behavior, and notwithstanding it's a 20-year veteran with outstanding references and doctors are going to be upset, and I'm just going to let the boom drop. Right. It's okay for you to be curious, but it was not permissible for the board to be curious, because then the board is treading into the territory, if this court has repeatedly said it's not up to the board to decide whether Dr. Pasternak was making a wise decision. Should he have gotten out there in the trenches to find out about every one of his 7,000 employees? Instead, he relied on what was put in front of him. There was nothing false in that e-mail to him, going back to the hypothetical. And he had no reason to think that he was treading into the NLRB's territory. It would never have occurred to them. And I would just like to conclude by coming back to the Katzpah issue and why we resist applying it here. First, because Title VII is a different statute than the National Labor Relations Act, in many cases saying that, so we can't automatically apply it. But most importantly, because the board did not apply it. There is not a shred of evidence, and by the way, the Supreme Court case had already been decided about Katzpah. The board did not make that finding. And so this is not the appropriate vehicle for this court to declare and substitute new findings for the board that the board did not make. Instead, not only Flagstaff, but Detroit News and the MECO case are cases in which this court has said you can't rely, the board cannot rely on lower-level supervisors to compensate for the proof of animus and knowledge by the decision-maker. That's our position. We appreciate your time. Thank you. I take the case under advisement.
judges: Rogers, Millett, Sentelle